FILED
2023 May-26 PM 01:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL JEROME JENNINGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 1:22-cv-01165-RDP** |
| | ) | |
| | ) | |
| **CHRISTOPHER SMITH,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF MICHAEL JEROME JENNINGS' BRIEF IN OPPOSITION TO DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff Michael Jerome Jennings, and submit this brief in opposition to Defendants Officers' motion for summary judgment.

---

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

---

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION……………………………………………....…….1

II.   PROCEDURAL
      HISTORY……………………………...................…..………..2

III.  PLAINTIFF'S RESPONSE TO DEFENDANT OFFICERS'
      STATEMENT OF UNDISPUTED FACTS.............................…..2

IV.   ADDITIONAL UNDISPUTED FACTS ……...........................………5

V.    ARGUMENT AND CITATION TO AUTHORITY..................................8

      A. Summary Judgment Standard………..…………………….............9

      B. Defendant Officers are <u>NOT</u> entitled to Summary Judgment on his
         Section 1983 Claims against Defendant Officers...............................10
         1.  <u>No arguable reasonable suspicion for an investigatory detention to
             justify the demand for an ID card or for Plaintiff to Identify
             himself</u>.......................................................................................10

         2.  <u>The Plaintiff was not required to produce his ID card/driver's license
             or to Identify himself to the Defendant officers under Alabama
             Law</u>...........................................................................................16

         3.  <u>The Defendant officers retaliated against the Plaintiff after engaging in
             protected speech under the First Amendment</u>......................................18

         4.  <u>The Defendant officers are not entitled to qualified immunity on
             Plaintiff's First and Fourth Amendment Claims</u>..................................20

         5.  <u>All Defendant Officers participated in the unlawful arrest of the
             Plaintiff and are not entitled to qualified immunity on Plaintiff's First
             and Fourth Amendment Claims</u>...........................................................22

**C. The Defendant Offices are NOT to State-Agent Immunity on the Plaintiff's State Law False Arrest Claim**............................................23

    1. <u>Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority in detaining and arresting the Plaintiff</u>...........24

    2. <u>Defendants acted under a mistaken interpretation of the law. in detaining and arresting the Plaintiff</u>.....................................................24


**VI.    CONCLUSION**…………......................................................……………26

Certificate of Filing and Service…………………………………….............…..28

## I.    INTRODUCTION[1]

On May 22, 2022, at approximately 6:29 p.m., Plaintiff Michael Jerome Jennings (hereinafter "Mr. Jennings of Plaintiff") was watering his neighbors' flowers when he was approached by Officer Christopher Smith (hereinafter "Officer Smith of Defendant Smith") of the Childersburg Police Department in Childersburg, Alabama. Despite the fact the Plaintiff was holding a water hose and watering flowers at the time Defendant Smith approached him, Defendant Smith asked the Plaintiff what he was doing at the neighbor's house; the Plaintiff responded by telling Defendant Smith he was watering flowers. Without any reasonable suspicion that the Plaintiff had committed a crime, Defendant Smith demanded for the Plaintiff to show him his identification/driver's license. Notably, although the Plaintiff was under no obligation under Alabama law to do so, Plaintiff disclosed his name to Defendant Smith as "Pastor Jennings" who lives across the street; and, further stated he was supposed to be there watering his neighbors' flowers while they are away. The Plaintiff was ultimately arrested and jailed by the individual Defendant without

---

[1] Plaintiff also take these facts as true for the limited purpose of summary judgment. Most of these facts are based on objective evidence in the record, such as video and audio recordings, and Plaintiff respectfully state that any such objective evidence should be taken as true and prevail over any attempted description of the facts that is "blatantly contradicted" by the objective evidence. See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (noting that "a court should not adopt" a party's description of the facts at summary judgment if it "is blatantly contracted" by objective evidence in the record, such as a video recording). However, the Plaintiff otherwise respectfully reserve the right to contest any and all facts at trial or at any other proceeding.

any arguable probable cause to do so for failing to provide his identification card and exercising his First Amendment right.  As noted by the Defendants, the entire incident was captured on body worn cameras worn by the Defendants on the date of the incident leaving absolutely no factual dispute as to what happened, summary judgment is proper against the individual Defendants for violating the Plaintiff's First and Fourth Amendment Rights and subjecting the Plaintiff to False Arrest under Alabama Law.

## II.    PROCEDURAL HISTORY

In the spirit of judicial economy, the Plaintiff adopts the Defendants' rendition of the procedural history of this action. The Plaintiff now files this brief in opposition to Defendant Officers' Motion for Summary Judgment and show that summary judgment is warranted against the Defendants Officers at this time.

## III.    PLAINTIFF'S RESPONSE TO DEFENDANT OFFICERS' STATEMENT OF UNDISPUTED FACTS

9.      When Defendant Smith first arrived on the scene (before his body worn camera activated), he saw an African American male (later identified as Jennings) standing in the yard, with nothing in his hands. (Doc. 47-3, at 37:11-16.).

**Disputed.** When Smith first arrived on the scene (before his body worn camera activated), the Plaintiff had a water hose in his hand watering his neighbor's flowers.  (Doc. 50-7, Declaration of Michael Jennings, at ¶¶ 5-8.); (Doc. 50-8, Video

surveillance mounted on Roy's home that depicts Plaintiff watering flowers on May 22, 2022.).

10.    When Smith's body worn camera activates, it depicts him walking around the corner of 401 6th Court, where a gold SUV is visible in the driveway and the African American male is standing at the corner of the house, now with a water hose in hand. (Doc. 47-4, at 18:23:51 to 18:24:09.).

**Disputed.** When Smith first arrived on the scene (before his body worn camera activated), the Plaintiff had a water hose in his hand watering his neighbor's flowers.  (Doc. 50-7, Declaration of Michael Jennings, at ¶¶ 5-8.); (Doc. 50-8, Video surveillance mounted on Roy's home that depicts Plaintiff watering flowers on May 22, 2022.).

89.    Gable stated that, based on the 911 call and the caller's statements that the neighbors were out of town, and no one was supposed to be there, he had a suspicion that the potential crimes of trespass or burglary were being committed. (Doc. 47-5, at 17:10-18, 19:17-22.)

**Disputed.** Amanda, the 911 caller, specifically told the 911 operator that she was *not sure* if someone was supposed to be at her neighbor's house and she is not saying whoever is over there should not be there. She just wanted someone to come and check to make sure whoever is there *supposed* to be there.

92.    Smith and Gable consistently testified that Jennings was arrested because he did not provide his name, which was hindering their investigation of the "suspicious persons" 911 call. (See, e.g., Doc. 47-3, at 34:3-6; Doc. 47-5, at 12:6-12.)

**Disputed.**    Defendant Smith only demanded for the Plaintiff to produce his identification/driver license. Notably, at the time Defendant Smith asked for the Plaintiff's identification, Defendant Smith made a hand gesture clearly indicating he was asking for the Plaintiff's ID card or driver's license to identify the Plaintiff. (Doc. 47-4, at 18:24:44 to 18:24:48.). Defendant Smith acknowledges in his written report that he was asking for the Plaintiff's driver's license. (Doc. 52-2, Pg. 2.). Defendants Smith and Gable both told Amanda that Defendant Smith wanted the Plaintiff's identification and not the Plaintiff's name. (Doc. 47-6, at 18:30:46 to 18:31:21.).

93.    Smith said that he first asked Jennings for his driver's license, then his name, but Jennings only told him "his title, Pastor Jennings," and. Smith said, "Pastor is [a] title. Jennings would be a first name or could be a last name." (Doc. 47-3, at 15:18-16:3.)

**Disputed.**    Defendant Smith never asked for the Plaintiff's name. Defendant Smith only demanded for the Plaintiff to produce his identification/driver license. Notably, at the time Defendant Smith asked for the Plaintiff's identification,

Defendant Smith made a hand gesture clearly indicating he was asking for the Plaintiff's ID card or driver's license to identify the Plaintiff. (Doc. 47-4, at 18:24:44 to 18:24:48.). Defendant Smith acknowledges in his written report that he was asking for the Plaintiff's driver's license. (Doc. 52-2, Pg. 2.). Defendants Smith and Gable both told Amanda that Defendant Smith wanted the Plaintiff's identification and not the Plaintiff's name. (Doc. 47-4, at 18:30:25 to 18:30:52.); (Doc. 47-6, at 18:30:46 to 18:31:21.). In fact, the Defendant Officers discussed with Amanda that the Plaintiff was arrested for saying they were racially profiling him, refusing to give his identification card and to tell them why he was on his neighbor's property. (Doc. 47-6, at 18:30:46 to 18:31:21.) ;(Doc. 47-8, at 18:30:53 to 18:31:21.) Further, the Plaintiff voluntarily disclosed to Defendant Smith that his name was "*Pastor Jennings, he lives across the street and that he was looking out for their house while they gone*. *I'm watering their flowers.*" (Doc. 47-4, at 18:24:34 to 18:24:44.)

## IV.    ADDITIONAL UNDISPUTED FACTS

1.    Amanda, the 911 caller, specifically told the 911 operator that she was not sure if someone was supposed to be at her neighbor's house and she is not saying whoever is over there should not be there. She just wanted for someone to come and check to make sure whoever is there supposed to be there. (Doc. 50-1 at 1:16-21; 2:17-21; 18:24:34 to 18:24:44.)

2.      When Defendant Smith arrived on scene, he didn't see anyone else present in the yard except the Plaintiff.  (Doc. 47-3, at 37:5-7.)

3.      Additionally, when Defendant Smith first observed the Plaintiff, the Plaintiff was not attempting to break into his neighbor's house. (Id., at 37:21-25.)

4.      During the interaction between the Plaintiff and Defendant Smith, at no time does the Plaintiff seem startled by Defendant Smith's presence at the scene. (Doc. 47-4, at 18:24:09 to 18:24:48.) At no time does the Plaintiff seem nervous by Defendant Smith's presence at the scene. (Id.).  At no time does the Plaintiff tries to avoid eye contact with Defendant Smith.  At no time does the Plaintiff tries to flee. At no time did Defendant Smith observe anyone else on the property besides the Plaintiff. (Id.).

5.      Defendant Smith only demanded for the Plaintiff to produce his identification/driver license. (Doc. 47-4, at 18:24:44 to 18:24:48.).  Notably, at the time Defendant Smith asked for the Plaintiff's identification, Defendant Smith made a hand gesture clearly indicating he was asking for the Plaintiff's ID card or driver's license to identify the Plaintiff. (Id.).

6.      Defendant Smith acknowledges in his written incident report that he was asking for the Plaintiff's driver's license. (Doc. 52-2, Pg. 2.).

7.      The Plaintiff told Defendant Smith he is not going to give him his identification card/ driver's license. (Doc. 47-4, at 18:24:48 to 18:24:49.)

8.      When Officer Justin Gable (hereinafter "Officer Gable of Defendant Gable") arrived on scene, the Plaintiff was still watering his neighbor's flowers. (Doc. 47-4, at 18:25:05 to 18:25:17.).

9.      During the interaction between the Plaintiff, Defendants Smith and Gable, at no time did the Plaintiff seem startled by Defendants Smith and Gable's presence at the scene. (Doc. 47-4, at 18:24:09 to 18:25:17. At no time did the Plaintiff seem nervous by Defendants Smith and Gable's presence at the scene. (Id.).

At no time does the Plaintiff tries to avoid eye contact with Defendants Smith and Gable. (Id.). At no time does the Plaintiff tries to flee. During the interaction with the Plaintiff, at no time did Defendants Smith and Gable observe anyone else on the property besides the Plaintiff. (Id.).

10.     Plaintiff again disclosed to Defendant Smith and now to Defendant Gable, why he was at his neighbor's house and points to his house across the street. (Id.)

11. Plaintiff then tells Defendants Gable and Smith he was not going to show them his identification. (Doc. 47-4, at 18:25:17 to 18:25:40.

12.     According to the Plaintiff's arrests warrant, he was arrested for failing to provide officers with identification when repeatedly asked, intentionally hindering

officers' investigation of 911 call. (Doc. 52-2, Pg. 8.). Plaintiff was charged with

Ala. Code § 13A-10-2- Obstructing governmental operations. (Id.).

13.    One June 1, 2022, the Childersburg Municipal Court dismissed the

Plaintiff charge of obstructing governmental operations with prejudice. Doc. 52-2,

Pg. 10.).

14.    Both Defendants Brooks and Gable acknowledged in their deposition

that *no Evidence of any break-in or burglary existed*.  (Doc. 47-7 at 39:19-24.);

(Doc. 47-5 at 22:4-6.).

15.    All Defendants officers acknowledged the Plaintiff was on private

property at the time the engaged him. (Doc. 47-7 at 36:16-21.); (Doc. 47-5 at 13:24-

14:3.); (Doc. 47-3 at 16:11-16.).

16.    All Defendants officers were employed by the City of Childersburg

Police Department at all times relevant to this action. (Doc. 47-6, at 18:30:46 to

18:31:21.) ;(Doc. 47-8, at 18:30:53 to 18:31:21.)

## V.    <u>ARGUMENT AND CITATION TO AUTHORITY</u>

Applying the statutory and judicial standards to the facts of this case, this

Honorable Court should lead to the conclusion that no genuine issue exists to be

tried as it relates to Defendants Smith, Gable and Brooks'liability on Plaintiff's

Fourteenth Amendment claim and Plaintiff's State Law False Imprisonment claim.

## A.     Motion for Summary Judgment Standard.

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citing Anderson, 477 U.S. at 248)). The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the non-moving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996) (citing Augusta Iron and Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). All reasonable doubts, however, are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

**B.    Defendants are <u>NOT</u> entitled to Summary Judgment on his Section 1983 Claims against Defendant Officers.**

1. <u>No arguable reasonable suspicion for an investigatory detention to justify the demand for an ID card or for Plaintiff to Identify himself.</u>

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Id. (citing <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)). Officers have great freedom to engage in consensual encounters with citizens.  See <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991) (stating that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"). But when an officer starts giving commands to a citizen that require compliance, the encounter becomes a seizure that must be supported by reasonable suspicion. See <u>United States v. Heard</u>, 725 Fed. Appx. 743, 751 (11th Cir. 2018) ("[The officer]'s orders to Heard to keep his hands at his side or to raise his hands were not requests but rather commands that clearly 'convey[ed] a message that compliance . . . [was] required.' <u>Bostick</u>, 501 U.S. at 435. Thus, we analyze whether the officers had reasonable suspicion at this

moment in time . . ..").  In the absence of reasonable suspicion justifying the stop, a person approached by an officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." Florida v. Royer, 460 U.S. 491, 497-98 (1983) (citing Terry, 392 U.S. at 32-33 (Harlan, J., concurring) and 34 (White, J., concurring)). An individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." Id. at 498 (citing United States v. Mendenhall, 446 U.S. 544, 556 (1980)). When considering whether officers had reasonable suspicion to conduct a Terry stop, a court cannot single out particular factors; rather, it "must examine the totality of the circumstances." United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012). In the case of a Terry stop, an officer is entitled to qualified immunity if he has "arguable" reasonable suspicion. Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000). If there is no objective factual basis for the claim of reasonable suspicion, there is no qualified immunity. Id. Whether a stop is made with arguable reasonable suspicion is measured by a purely objective standard of what a reasonable officer in the defendant's position would have perceived. Young v. Eslinger, 244 Fed. Appx. 278, 279-80 (11th Cir. 2007).

No reasonable jury can conclude that the Defendant officers had an arguable reasonable suspicion to believe the Plaintiff was committing a crime once they made

contact with him. The totality of the circumstances showed that no criminal activity was afoot. As stated above, on May 22, 2022, at approximately 6:20 p.m., Talladega E-911received a 911 call regarding the location of 401 6th Court Southwest in Childersburg. The 911 caller identified herself as "Amanda". Amanda stated that she wanted "somebody to come over here and check," because her "neighbors went out of town this morning to Gatlinburg, and there's a vehicle over there with people ***I don't think are supposed to be over there***. Notably, Amanda was not sure if any criminality was afoot in her reporting to 911 because she was not sure if someone was supposed to be at her neighbor's house or not. Further, Amanda added that the neighbors were an "elderly white couple" and that Amanda had seen "a younger black male over there;" she added that "***they***" were outside the vehicle and that she had heard "them" "talking a minute ago out like in their back door, and I can't hear them talking anymore, so they ***may*** be in the house now. I don't know." Once again Amanda was not sure if any criminality was afoot in her reporting to 911. Essentially, her 911 call tantamounted to a welfare check of her neighbor's property at best because she did not observe any criminality of any kind and more importantly, she didn't report any criminality to 911. However, the Plaintiff do not dispute that Amanda's 911 call gave law enforcement a reason to make contact with the property and ultimately with Plaintiff who was watering flowers at the time on the property.

Based on the totality of the circumstances no arguable suspicion of criminal activity existed. First, when Defendant Smith arrived on scene, he didn't see anyone else present on the property except the Plaintiff contrary to what Amanda reported to 911. At that time the veracity of Amanda's report to 911 was grossly undermined. Second, what did Defendant find on the property? Defendant Smith found a middle age black man watering flowers. This Court should note that Defendant Smith and the Plaintiff greeted one another. Although the Plaintiff was under no legal obligation to converse with Defendant Smith, when Defendant questioned why the Plaintiff was on the property, the Plaintiff told him he was watering his neighbor's flowers and was supposed to be there. The Plaintiff told Defendant Smith that he was Pastor Jennings and that he lived across the street. Further, the Plaintiff stated to Defendant Smith, "I'm looking out for they house while they gone. I'm watering their flowers." This Court should note that during the interaction between the Plaintiff and Defendant Smith, at no time does the Plaintiff seem startled by Defendant Smith's present. At no time does the Plaintiff seem nervous by Defendant Smith's present. At no time does the Plaintiff tries to avoid eye contact with Defendant Smith. At no time does the Plaintiff tries to flee. At no time did Defendant Smith observe anyone else on the property besides the Plaintiff. Simply stated, there was no objective arguable reasonable suspicion to justify the detention and arrest of the Plaintiff. Finally, the factual basis of the Plaintiff's action is grossly different

13

from the facts in Edger v. McCabe, 572 F. Supp. 3d 1143 (N.D. Ala. 2021). In Edger, Kendraus Turner, the church's on-duty security guard, called 9-1-1. He reported to the dispatcher that he'd seen two Hispanic males on church grounds while on foot patrol. Specifically, Turner reported that the men were "messing with an employee's car that was left on the lot" and that they had removed one of the car's wheels. At approximately 8:36 p.m., Officer McCabe arrived at the church and made contact with Edger and Nuby (Edger's associate). When Officer McCabe arrived, Edger was laying on the ground on the passenger side of Mrs. Ghosh's car, jacking it up. Id. at 1147. Further, the District Court Judge in Edger, granted qualified immunity to the officers because one could validly argue that an officer just arriving on the scene could have reasonably believed that the men could have been doing something criminal. e.g., stealing tires. Essentially in Edger, Turner reported a theft in process. Unlike in Edger, Amanda, the 911 caller, did not report a crime or suspicion of a crime, at best she wanted a welfare check to be performed on her neighbor's home. She only told the 911 operator that she was ***not sure*** if someone was supposed to be at her neighbor's house and she is ***not saying whoever is over there should not be there***. She just wanted someone to come and check to make sure whoever is there ***supposed*** to be there. Also unlike in Edger, when Defendant Smith first arrived on the scene (before his body worn camera activated), the Plaintiff had a water hose in his hand watering his neighbor's flowers. When Defendant Smith arrived on scene,

he didn't see anyone else present in the yard except the Plaintiff.  Additionally, when Defendant Smith first observed the Plaintiff, the Plaintiff was not attempting to break into his neighbor's house.   During the interaction between the Plaintiff and Defendant Smith, at no time does the Plaintiff seem startled by Defendant Smith's presence at the scene. At no time does the Plaintiff seem nervous by Defendant Smith's presence at the scene. At no time does the Plaintiff tries to avoid eye contact with Defendant Smith.  At no time does the Plaintiff tries to flee. At no time did Defendant Smith observe anyone else on the property besides the Plaintiff. It is undisputed when Defendant Smith approached the Plaintiff, he observed the Plaintiff watering flowers (Doc. 47-4, at 18:24:14 to 18:24:19.) Defendant Smith then explains that "they are saying this vehicle is not supposed to be here and you're not supposed to be here," and the Plaintiff male asks, "Who's saying that?" (Doc. 47-4, at 18:24:31 to 18:24:34.) Defendant Smith says, "They called about it. I don't know who called." The Plaintiff then says, "I'm supposed to be here. I'm Pastor Jennings. I live across the street." The Plaintiff further states, "I'm looking out for they house while they gone. I'm watering they flowers." (Doc. 47-4, at 18:24:34 to 18:24:44.). Notably, the Edger case turned on the officer reasonable but mistakenly believed that Edger's failure to provide his driver's license violated Ala. Code § 15-5-30, after officer reasonably believed that the men could have been doing something criminal. e.g., stealing tires. Therefore, the district court determined that the officers had

arguable probable cause and qualified immunity attached to the officer's actions. In the case at bar, no arguable reasonable suspicion existed ab initio, nor did any arguable probable caused manifest throughout the encounter with the Defendant Officers on the day in question that warranted Plaintiff's arrest.

    2.  <u>The Plaintiff was not required to produce his ID card/driver's license or to Identify himself to the Defendant officers under Alabama Law.</u>

The Supreme Court has analyzed an arrest made when a suspect refuses to produce identification and has held that although a person stopped in a *Terry* investigative stop is not required under the Fourth Amendment to answer questions, a "state law requiring a suspect to disclose his name in the course of a **valid** *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures." <u>Hiibel v. Sixth Judicial Dist. of Nevada, Humboldt Cty</u>., 542 U.S. 177, 187 (2004) (emphasis added). In this case, Alabama has such a statute. *See* <u>Ala. Code §15-5-30</u>. Ala. Code § 15-5-30 provides the following:

> A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions.

Ala. Code § 15-5-30.

According to the Defendant officers, Plaintiff was unlawfully detained/arrested for failing to provide the Defendant officers with identification. The "plain language" in Ala. Code § 15-5-30, that a *law enforcement officer* may stop any person abroad in a ***public place*** whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions. It is undisputed that the Plaintiff was on ***private property*** when he was accosted by the Defendant officers. Thus, the Plaintiff was under no legal obligation to provide the individual Defendant officers his driver license, his name, address, and explanation of his actions, or his identification to Defendant officers. Moreover, Ala. Code § 22-15A-3(8) clearly states that a private residence is not a "public place."  Notably, all of the Defendant officers deposed that the Plaintiff was on private property. Further, the above statute does not require a suspect to give the officer a driver's license or any other document." See Hiibel, 542 U.S. at 185. Based on the record and contrary to the Defendant officers' argument, Defendant Smith clearly demanded for the Plaintiff to produce his identification/driver license. Notably, at the time Defendant Smith asked for the Plaintiff's identification, Defendant Smith made a hand gesture clearly indicating he was asking for the Plaintiff's ID card or driver's license to identify the Plaintiff. Further, Defendant Smith acknowledges in his written report

17

that he was asking for the Plaintiff's driver's license. Notably, the Defendant collectively admitted to Amanda that the Plaintiff was arrested for saying he was being racially profiled, *refusing to give his identification card* and to tell them why he was on his neighbor's property.

As articulated above, the Defendant officers had no arguable reasonably suspicions that the Plaintiff was committing, has committed or is about to commit a felony or other public offense to warrant him to ask Plaintiff's name, address and an explanation of his actions. Further, the Defendant officers accosted the Plaintiff on *private property and was under no legal authority to demand the Plaintiff to provide* his name, address and an explanation of his actions to the Defendant officers. Notably, and contrary to the Defendant officers' argument, the Plaintiff told Defendant Smith his name was Pastor Jennings, why he was on the property and pointed to his house. Therefore, the Plaintiff's detention and subsequently arrest violated Alabama's well established statutory law.

3. The Defendant officers retaliated against the Plaintiff after engaging in protected speech under the First Amendment.

At the time of the complained of events, the Plaintiff had a clearly established constitutional right under the First Amendment to be free from arrest after engaging in protected speech under the First Amendment. "It is also clearly established law in this Circuit that law enforcement officers cannot punish or retaliate against individuals for expressing their First Amendment rights. Bennet v. Hendrix, 423

18

F.3d 1247, 1255-56 (11th Cir. 2005). It is unequivocally and objectively clear, based on body worn camara footage, that the Plaintiff was placed in a police car and transported to jail only after he verbally expressed his displeasure of how Defendant Brooks was speaking to him. As aforementioned, Defendant Brooks can be heard telling the Plaintiff, "They have a right to identify you." Defendant Brooks then says, "Sir, listen. You won't listen," and the Plaintiff says, "Y'all don't listen."
Defendant Brooks explains that "everything is being audio and video recorded," and says, "You won't shut your mouth." (Doc. 47-8, at 18:27:54 to 18:27:56.) The Plaintiff then tells Defendant Brooks, "You don't shut your mouth. You don't talk to me like I'm a child, Boy."  Defendant Smith turns away from his police car and says, "You know what? 10-15, 10-15. I ain't gonna sit there and have that, dude."

Defendant Brooks also says, virtually simultaneously, "You know what? Go ahead, you're going to jail. ***You talked your way into going to jail***." The Defendant officers made the decision to arrest and transport the Plaintiff after they illegal detained him in retaliation after Pastor Jennings engaged in constitutionally protected speech and conduct.  The statements made by Pastor Jennings were not fighting words. The statements and conduct of Pastor Jennings constituted protected speech under the First Amendment.  Therefore, the Plaintiff's arrest was in violation of his First Amendment rights.

4. <u>The Defendant officers are not entitled to qualified immunity on Plaintiff's First and Fourth Amendment Claims.</u>

Qualified immunity shields officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, (1982). In the case of a Terry stop, an officer is entitled to qualified immunity if he has "arguable" reasonable suspicion. <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1166 (11th Cir. 2000). If there is no objective factual basis for the claim of reasonable suspicion, there is no qualified immunity. <u>Id.</u> Whether a stop is made with arguable reasonable suspicion is measured by a purely objective standard of what a reasonable officer in the defendant's position would have perceived. <u>Young v. Eslinger</u>, 244 Fed. Appx. 278, 279-80 (11th Cir. 2007). Based on the above facts and authority, the Defendant officers are not entitled to qualified immunity because the detention of the Plaintiff was unlawful ab initio. No reasonable jury can conclude that the Defendant officers had an arguable reasonable suspicion to believe the Plaintiff was committing a crime once they made contact with him. Further, it has been clearly established that in the absence of reasonable suspicion justifying the stop, a person approached by an officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." <u>Florida v. Royer</u>, 460 U.S. 491, 497-98 (1983) (citing <u>Terry</u>, 392 U.S. at 32-33 (Harlan, J., concurring) and 34 (White, J., concurring)). An

individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." Id. at 498 (citing United States v. Mendenhall, 446 U.S. 544, 556 (1980)). "It is also clearly established law in this Circuit that law enforcement officers cannot punish or retaliate against individuals for expressing their First Amendment rights. Bennet v. Hendrix, 423 F.3d 1247, 1255-56 (11th Cir. 2005). It is unequivocally and objectively clear, based on body worn camara footage, that the Plaintiff was placed in a police car and transported to jail only after he verbally expressed his displeasure of how Defendant Brooks was speaking to him. Therefore, the Defendant officers are not entitled to qualified immunity on Plaintiff's First and Fourth Amendment claims. Finally, clear objective evidence, the body worn cameras shows that Defendant Smith arrested the Plaintiff after he was unlawfully detained by Defendant Gable and Defendant Brooks was an active participant in the arrest of the Plaintiff. As aforementioned, Defendant Brooks stated, to the Plaintiff, "You know what? Go ahead, you're going to jail. You talked your way into going to jail." In fact, Defendant Brooks told Amanda that the Plaintiff was arrested for saying he was being racially profiled, refusing to give his identification card and to tell them why he was on his neighbor's property.

5. <u>All Defendant Officers participated in the unlawful arrest of the Plaintiff and are not entitled to qualified immunity on Plaintiff's First and Fourth Amendment Claims.</u>

The Defendants argues that Defendants Gable and Brooks are not liable because Defendant Smith performed the arrest. However, video evidence clearly shows that Defendants Gable and Brooks are not just bystanders but were direct participants in the unlawful detention and arrest of the Plaintiff. First, Defendant Gable applied handcuffs on the Plaintiff and restricted the Plaintiff's movement. (Doc. 47-4, at 18:26:15 to 18:26:23; Doc. 47-6, at 18:26:15 to 18:26:23.) As stated above, Defendant Brooks nor the other Defendants, possessed any arguable reasonable suspicion to believe the Plaintiff was committing a crime once they made contact with him. The totality of the circumstances showed that no criminal activity was afoot. If there is no objective factual basis for the claim of reasonable suspicion, there is no qualified immunity. <u>Jackson</u> at 1156. Second, Defendant Brooks stated, virtually simultaneously with Defendant Smith, "You know what? Go ahead, you're going to jail. You talked your way into going to jail." (Doc. 47-8, at 18:28:00 to 18:28:07.)  In fact, the Defendant Officers disclosed to Amanda their true animus of why they arrested the Plaintiff. They disclosed to her, the Plaintiff was arrested for saying they were racially profiling him, refusing to give his identification card and to tell them why he was on his neighbor's property. Further, it is well established that a non-arresting officer may be liable for failing to intervene in an unlawful arrest

"if he knew the arrest lacked any constitutional basis and yet participated in some way." See Wilkerson v. Seymour, 736 F.3d 974, 980 (11th Cir. 2013). Although both Defendants Gable and Brooks directly participated in the unlawful detention and arrest of the Plaintiff, at minimum they are liable for their failure to intervene making them directly liable under Section 1983.

## C. The Defendant Offices are NOT to State-Agent Immunity on the Plaintiff's State Law False Arrest Claim.

Police officers in the state of Alabama have State-agent immunity from any "tort liability arising out of [their] conduct in the performance of any discretionary function within the line and scope of [their] law enforcement duties." Ala. Code § 6-5-338(a) (1975). This entitlement to immunity applies to an officer's exercise of judgment in enforcing the criminal laws (including arrests and attempted arrests) unless the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. See Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), holding modified by Hollis v. City of Brighton, 950 So. 2d 300 (Ala. 2006); Howard v. City of Atmore, 887 So. 2d 201, 204–05 (Ala. 2003) (citation omitted). However, the record is inundated with facts that show the Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

1.     <u>Defendants acted willfully, maliciously, fraudulently, in bad faith,
       beyond their authority in detaining and arresting the Plaintiff.</u>

No arguable reasonable suspicion for an investigatory detention to justify the demand for an ID card or for Plaintiff to Identify himself. The Defendant officers retaliated against the Plaintiff after engaging in protected speech under the First Amendment. This Court need not venture outside of the video evidence that illuminates that the Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority in detaining and arresting the Plaintiff. Defendant Brooks admitted to Amanda that the Plaintiff was arrested for saying he was being racially profiled, refusing to give his identification card and to tell them why he was on his neighbor's property. This Court should take this admission as key evidence that the Defendant officers acted willfully, maliciously, fraudulently, in bad faith, beyond their authority in detaining and arresting the Plaintiff. First, the Plaintiff had/has an absolute First Amendment right to voice his opinion of why he was being arrested. Next, as outlined above, the Plaintiff was under no legal obligation to provide the Defendant officers with his identification card or identity based on the circumstances and facts in this case.

2.     <u>Defendants acted under a mistaken interpretation of the law. in
       detaining and arresting the Plaintiff.</u>

According to the Defendant officers, Plaintiff was unlawful detained/arrested for failing to provide the Defendant officers with identification. The "plain

language" in Ala. Code § 15-5-30, that a *law enforcement officer* may stop any person abroad in a **public place** whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions. It is undisputed that the Plaintiff was on **private property** when he was accosted by the Defendant officers. Thus, the Plaintiff was under no legal obligation to provide the individual Defendant officers his driver license, his name, address, and explanation of his actions, or his identification to Defendants officers. Moreover, Ala. Code § 22- 15A-3(8) clearly states that a private residence is not a "public place." Notably, all of the Defendant officers deposed that the Plaintiff was on private property. Further, the above statute does not require a suspect to give the officer a driver's license or any other document." See Hiibel, 542 U.S. at 185. Based on the record and contrary to the Defendant officers' argument, Defendant Smith clearly demanded for the Plaintiff to produce his identification/driver license. Notably, at the time Defendant Smith asked for the Plaintiff's identification, Defendant Smith made a hand gesture clearly indicating he was asking for the Plaintiff's ID card or driver's license to identify the Plaintiff. Further, Defendant Smith acknowledges in his written report that he was asking for the Plaintiff's driver's license. As stated above, the Defendant Officers discussed with Amanda that the Plaintiff was arrested for saying they were racially profiling him, refusing to give his identification card and to tell them why he was on

his neighbor's property.   This entitlement to immunity applies to an officer's exercise of judgment in enforcing the criminal laws (including arrests and attempted arrests) unless the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. See Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), holding modified by Hollis v. City of Brighton, 950 So. 2d 300 (Ala. 2006); Howard v. City of Atmore, 887 So. 2d 201, 204–05 (Ala. 2003) (citation omitted). Based on the above, the Defendant Offices are not entitled to state-agent immunity on the Plaintiff's state law false arrest claim.

## VI.    CONCLUSION

The Plaintiff respectfully request this Honorable Court to deny the Defendant Officers' summary judgment in its entirety.

Respectfully submitted this 26th day of May 2023,

/s/Harry M. Daniels, Esq.
Harry M. Daniels, Esq.
(*Admitted Pro hac vice*)

**LAW OFFICES OF HARRY M. DANIELS, LLC**
4751 Best Road Suite 490
Atlanta, Georgia 30337
Tel: 678.664.8529
Fax: 800.864.5248
Email: daniels@harrymdaniels.com

26

/s/ Bethaney Embry Jones
Bethaney Embry Jones, Esq.
Alabama Bar Number: 1057B67U

**THE EMBRY LAW FIRM, LLC**
12531 Veterans Memorial Highway
Douglasville, Georgia 30134
Tel. 678.701.5238
Fax: 678.384.4545
Email: bembry@embrylawfirm.com

Joi Travis, Esq.
Alabama Bar Number: 6611L44K

**TRAVIS LAW, LLC**
P.O. Box 550274
Birmingham, Alabama 35255
Tel. 205.453.9331
Cell.  205.720.9527
Fax:   205.778.3123
Email: joi@travislawllc.com

Roderick Van Daniel, Esq.
Alabama Bar Number: 9105L64X

**THE RODERICK VAN DANIEL, LLC**
13th Avenue South Suite 19
Birmingham, Alabama 35255
Tel: 205.317.9321
roddaniel205@gmail.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that the following has been served a copy of the foregoing document, on the 26th day of May 2023, by emailing opposing counsel; or, if the party being served is a registered participant in the ECF System of the United States District Court for the Northern District of Alabama, by a "Notice of Electronic Filing" pursuant to N.D. Ala. Local Rule 5.4:

C. David Stubbs
Attorney for Defendants
OF COUNSEL: STUBBS, SILLS & FRYE P.C.
1724 South Quintard Avenue Post Office Box 2023
Anniston, Alabama 36202
(256) 835-5050
david@stubbssillsfrye.com

/s/Harry M. Daniels
Harry M. Daniels, Esq
(Admitted Pro hac vice)