FILED

2023 Dec-21  PM 05:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JEROME JENNINGS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CASE NO.: 1:22-cv-01165-RDP** |
| | ) | |
| CHRISTOPHER SMITH, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on Defendants Christopher Smith, Justin Gable, and Jeremy Brooks' (collectively "Defendants") Motion for Summary Judgment. (Doc. # 48). The Motion has been fully briefed. (Docs. # 48, 51, 56). After the Eleventh Circuit published its decision in *Edger v. McCabe*, 84 F.4th 1230 (11th Cir. 2023), the court directed the parties to brief what effect that opinion had on Defendants' Motion. (Doc. # 57). The parties provided supplemental briefing in response to that order. (Docs. # 58, 59). After careful review of the parties' briefs and the Rule 56 record, and for the reasons outlined below, the court concludes Defendants' Motion (Doc. # 48) is due to be granted.

## I.    Background[1]

On May 22, 2022, at approximately 6:20 p.m., the Talladega County Emergency Management Communications District received a 911 call from a caller who identified herself as "Amanda" requesting police officers to check on a neighbor's home. (Doc. # 47-1). Amanda stated

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

that her neighbors had left town that morning and that an unknown gold vehicle was parked in front with people she did not think should be over there. (*Id.* at 00:26 to 00:35). Amanda added that the neighbors were an elderly white couple but that she had seen a younger black male over there a few minutes before. (*Id.* at 00:56 to 1:01). She further stated that she could not see them but had heard "them talking a minute ago out like in their back door, and I can't hear them talking anymore, so they may be in the house now. I don't know." (*Id.* at 1:20 to 1:34).

Childersburg Police Officer Christopher Smith ("Defendant Smith") was dispatched on the call and arrived about five minutes later to the residence. When Defendant Smith arrived at the residence, he saw Plaintiff, an African American male, standing in the yard holding a watering hose. (Doc. # 47-4 at 18:24:08). When asked what he was doing on the property, Plaintiff responded, "watering flowers." (*Id.* at 18:24:16). Defendant Smith then asked if Plaintiff lived at the residence; Plaintiff responded he did not. (*Id.* at 18:24:28 to 18:24:31). Defendant Smith explained someone had called 911 and reported that Plaintiff was not supposed to be on the property. (*Id.* at 18:24:30 to 18:24:37). Plaintiff responded, "I'm supposed to be here. I'm Pastor Jennings. I live across the street…. I'm looking out for the house while they gone, I'm watering they flowers." (*Id.* at 18:24:37 to 18:24:45).

At this point, Defendant Smith asked Plaintiff if he had any form of identification. (*Id.* at 18:24:45 to 18:24:48). Plaintiff stopped watering the flowers and walked away, stating, "Oh, no man, I'm not gonna give you no ID" and "I ain't did nothing wrong." (*Id.* at 18:24:46 to 18:24:51). Defendant Smith replied, "Well, look, listen I'm not saying that you did nothing wrong, there's a suspicious person in the yard, and if you're not going to identify yourself …." (*Id.* at 18:24:52 to 18:25:06). Plaintiff stated that he did not have to identify himself because Alabama was not a stop-and-identify state. (*Id.* at 18:25:07 to 18:25:10).

Childersburg Police Officer Justin Gable ("Defendant Gable") arrived at the scene at this point and has testified that he immediately heard Plaintiff being "loud." (Doc. #47-5 at 4). Plaintiff gestured to Defendant Gable and stated, "That guy know me. He come to my store that got broke in. I live right over there across the street." (Doc. # 47-4 at 18:25:10 to 18:25:16). Defendant Gable asked Plaintiff if he lived at the house, to which Plaintiff replied, "You see a black man out here watering the neighbors' flowers…" before continuing with "You have no right to approach me if I ain't did nothing suspicious, or nothing wrong. Told him I'm a pastor, I pastor at a church …." (*Id.* at 18:25:21 to 18:25:34).

Plaintiff and the two officers continued talking over each other, before Defendant Gable reiterated that they had received a call that a suspicious person was on the property. (*Id.* at 18:25:42). Plaintiff walked towards him and dropped the water hose; he then walked away from the officers and around the side of the house yelling, "I don't care who called y'all…. lock me up and see what happens." (*Id.* at 18:25:42 to 18:25:46). Defendants Smith and Gable followed Plaintiff around the house, emphasizing, "Hey man, just come here and talk to us." (*Id.* at 18:25:47 to 18:25:49). Plaintiff continued to walk away, stating, "I'm going to water these back flowers is what I'm fixing to do" as well as, "Tell me who called y'all." (*Id.* at 18:25:49 to 18:25:53).

Defendant Gable warned Plaintiff that he was going to get an "obstruction charge" if he continued walking away from the officers. (*Id.* at 18:25:55 to 18:26:05). Plaintiff stopped, turned around, and responded, "You can do whatever you want. Do it." (*Id.*). At this point, the officers detained Plaintiff and applied handcuffs to him, stating, "We're just trying to talk to you" and "I don't want to argue with you….I don't want to arrest you either." (*Id.* at 18:26:05 to 18:26:27). Plaintiff replied, "Go ahead and do what you gotta do, go on and lock me up….it's already a lawsuit." (*Id.*)

3

At that point, Sergeant Jeremy Brooks ("Defendant Brooks") arrived at the scene. Plaintiff continued talking, stating "My son was just racially profiled in Michigan, he's got his master's degree….three police officers had profiled him and came in, I was an ex-police officer doing what I told you. I'm a pastor." (*Id.* at 18:26:42 to 18:26:58). Defendant Gable and Plaintiff both began yelling loudly over each other, with Plaintiff saying, "I don't have to ID myself, take me down and book me, do what you need to do" and Defendant Gable saying, "I have a call on you, you have to identify yourself to me, do you understand that?" (*Id.* at 18:27:00 to 18:27:10). Defendant Gable also stated, "It's okay if you're here to water the plants, talk to us," to which Plaintiff replied, "No, it's alright, it's already a lawsuit, that's fine." (Doc. #47-8, at 18:27:22 to 18:27:27).

A few more minutes of arguing ensued, before Defendant Brooks eventually stated, "Everything is being audio and video recorded…You won't shut your mouth." (*Id.* at 18:27:53 to 18:27:57). Plaintiff then yelled, "You don't shut your mouth! You don't talk to me like I'm a child, boy." (*Id.* at 18:27:57 to 18:28:00). At this point, Defendant Smith walked up to Plaintiff, stating "You know what? 10-15, 10-15. I ain't gonna sit there and have that, dude." (*Id.* at 18:27:58 to 18:28:05). Defendant Brooks simultaneously stated, "Look? Go ahead, you're going to jail. You talked your way into going to jail." (*Id.* at 18:28:00 to 18:28:08).

Plaintiff was escorted to a police cruiser and put in the back seat. After running the tag on the gold vehicle, Defendant Smith asked Plaintiff if he was Roy Mallum – the registered owner of the car. (Doc. # 47-4 at 18:32:03 to 18:32:12). Only at that point, while in the police cruiser, did Plaintiff respond that his name was Michael Jennings. (*Id.*)

Meanwhile, Amanda – the 911 caller – conversed with Defendants. Amanda stated that she did not realize it was Plaintiff in the neighbors' yard and believed it to be a teenager, or she would not have called. (Doc. # 47-6 at 18:30:59 to 18:31:10). She further stated, "He does live right there,

and he would probably be watering their flowers; this is probably my fault." (Doc. # 47-4 at 18:31:20 to 18:31:26). Amanda refused to give Defendants her full name for fear it would be published in the paper in connection with the event. (Doc. # 47-6 at 18:33:15 to 18:33:47). Defendant Brooks replied that her name would be on the notes of the investigation and any other information could be obtained by running her car tag if necessary. (Doc. # 47-4 at 18:37:53 to 18:38:14).

Shortly thereafter, Defendant Smith approached Plaintiff while he was seated in the police cruiser and stated, "Any time the police come out, and they say 'we want to identify you,' you have to identify yourself, because there's a reasonable suspicion that it's a….man, that there's a vehicle." (*Id.* at 18:32:41 to 18:32:50). Defendant Smith further explained that if Plaintiff had simply told the officers his name, it might have dispelled any reasonable suspicion. (*Id.* at 18:32:53 to 18:32:57). Plaintiff replied that he had told him his name was Pastor Jennings, to which Defendant Smith replied, "That's not a name; that's a pastor." (*Id.* at 18:32:56 to 18:33:05).

The Defendants convened to discuss potential charges that might apply to Jennings. (*Id.* at 18:34:20 to 18:34:30). Defendant Gable stated that it had been impossible to talk to Plaintiff because all he would reference was "racial profiling" and "suing," but that he had not planned on detaining Plaintiff until he began speed walking away as the officers were trying to speak to him. (*Id.* at 18:38:40 to 18:38:55). Defendants decided to charge Plaintiff with the sole offense of "obstructing governmental operations" on the basis that the officers were responding to a call and Plaintiff would not give them his name or other information. (*Id.* at 18:38:55 to 18:39:14). During this discussion, Defendant Gable remarked, "He seems like a reasonable nice guy, I don't understand….just talk to us, man…" (*Id.* at 18:39:35 to 18:39:55).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if … there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a

properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Although the court must resolve all reasonable doubts in favor of the non-movant, this does not mean the court cannot rely on objective videotape evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, if a videotape clearly depicts events and leaves no material factual disputes, the court need not rely on one party's version of facts when they are obviously discredited by that undisputed video evidence. *Id.* at 380–81.

## III.    Discussion

Plaintiff filed this action against Defendants Smith, Gable, Brooks, and the City of Childersburg on September 9, 2022. (Doc. # 1). He amended his complaint on November 1, 2022 (Doc. # 16), and the amended pleadings include four claims: (1) an unlawful arrest claim against

Smith, Gable, and Brooks pursuant to 42 U.S.C. § 1983 (Count 1); (2) a retaliatory arrest claim against Smith, Gable, and Brooks pursuant to 42 U.S.C. § 1983 (Count 2); (3) a state-law false arrest claim against Smith, Gable, and Brooks (Count 3); and (4) a state-law false arrest claim against the City of Childersburg (Count 4). (Doc. # 16).

The City of Childersburg filed a Motion to Dismiss the state-law false arrest claim against it. (Doc. # 46). Simultaneously, Defendants Smith, Gable, and Brooks filed a Motion for Summary Judgment. (Doc. # 48). The court will address the City of Childersburg's Motion to Dismiss in a separate memorandum opinion. So, this memorandum opinion focuses on Defendants Smith, Gable, and Brooks' claims, which are discussed below.

### A.    Plaintiff's Claims Under § 1983

Section 1983 "provides a method for vindicating federal rights conferred by the Constitution and federal statutes." *Proescher v. Bell*, 966 F. Supp. 2d 1350, 1359 (N.D. Ga. 2013) (citing *Baler v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  A plaintiff bringing a § 1983 claim must show "that the conduct complained of (1) was committed by a person acting under color of state law; and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id.* (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992)) (internal quotes and citations omitted). Here, understandably, Defendants do not contest that they were acting under color of law. So, the relevant dispositive question is whether they deprived Plaintiff of his constitutional rights.

### 1.    Unlawful Arrest

Under the Fourth Amendment, an individual has a right to be free from unreasonable searches and seizures. The reasonableness of an arrest is determined by the presence or absence of probable cause for the arrest. *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007).

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim, but the existence of probable cause at the time of the arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1324 (11th Cir. 2014) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010)).

An officer possesses probable cause when "the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown*, 608 F.3d at 734 (citing *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997)). Further, probable cause only requires that there be a substantial chance of criminal activity. "We do not require that there be proof beyond a reasonable doubt of an arrestee's guilt, or even that there be a preponderance of evidence to support arrest. In other words, '[p]robable cause is not a high bar.'" *Turner v. Williams*, 65 F.4th 564, 581-582 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

Whether an officer possesses probable cause to arrest an individual depends on the elements of the alleged crime and the operative fact pattern. *Morris*, 748 F.3d at 1324; *Skop*, 485 F.3d 1137-38. Therefore, the reasonableness of Plaintiff's arrest for obstructing governmental operations hinges on the elements of Alabama Code § 13A-10-2(a), which states:

> A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independent unlawful act, he: (1) intentionally obstructs, impairs or hinders the administration of law or other governmental function; or (2) intentionally prevents a public servant from performing a governmental function.

Ala. Code § 13A-10-2. A governmental function includes any activity which a public servant is legally authorized to undertake on behalf of a government. Ala. Code § 13A-10-

1(3). In addition, a public servant includes any officer or employee of the government. Ala. Code § 13A-10-1(7).

Defendants argue that they had probable cause to arrest Plaintiff under § 13A-10-2(a) because: (1) Plaintiff used intimidation, physical force, or interference to intentionally prevent the officers from performing the governmental function of investigating the scene; and (2) Plaintiff engaged in illegal activity by refusing to identify himself to them, with the intent of preventing them from performing the governmental function of conducting an investigation. In the alternative, Defendants argue that even if the court finds they lacked probable cause to arrest Plaintiff, they are entitled to qualified immunity because there was arguable probable cause for the arrest. The court addresses each of these arguments below.

### a.      Intimidation or Physical Interference

Defendants first contend that Plaintiff's behavior rose to the level of intimidation or physical interference under Alabama Code § 13A-10-2 that prevented the officers from responding to the 911 call. This court is not convinced.

Alabama courts have held that Alabama Code § 13A-10-2 requires that any interference be physical interference and that words alone fail to provide culpability under the statute. *D.A.D.O. v. State*, 57 So. 3d 798, 806 (Ala. Crim. App. 2009); *see generally A.A.G. v. State*, 668 So. 2d 122 (Ala. Crim. App. 1995) (holding that an individual delaying opening a door for officers, running away from them as they attempted to search the residence, and striking an officer amounted to intimidation or physical interference under § 13A-10-2); *Scott v. Palmer*, 210 F. Supp. 3d 1303 (N.D. Ala. 2016), *aff'd sub. nom. Scott v. City of Red Bay, Alabama*, 686 F. App'x 631 (11th Cir. 2017) (holding that an individual stepping *towards* officers while saying the words "we got county law down here" were words coupled with conduct that was sufficient to be physical in nature under

the statute); *Dawson v. Jackson*, 748 Fed. App'x 298 (11th Cir. 2018) (holding that a defendant ordering officers off his property, physically standing in their way, refusing to move his car, and refusing to comply with instructions they gave him based on a valid abatement order amounted to intimidation or physical interference under § 13A-10-2). But, an individual who only yells at officers while walking away from them does not rise to the level of intimidation or interference required by § 13A-10-2. *See generally D.A.D.O.,* 57 So. 3d 798 (Ala. Crim. App. 2009) (holding that an individual's loud outbursts and his boisterous yelling of, "man you don't tell me what to do. I can talk to them anytime I want to. I don't like the way you're talking to me" as he walked *away* from officers did not rise to the level of being physical in nature to qualify as intimidation or physical interference under § 13A-10-2).

Defendants allege that Plaintiff's conduct -- including speaking in a loud tone, being uncooperative with the investigation, and making statements that the Defendants should arrest him and "see what happens" -- meets the criteria of physical interference required by § 13A-10-2. Again, the court disagrees.

As the court determined in *D.A.D.O*, an individual merely yelling at officers – while potentially annoying – does not rise to the level of physical interference required under the statute, because words alone are not enough. 57 So. 3d at 806-07. Further, although Plaintiff's statement of "lock me up, see what happens" could potentially be perceived as menacing, it was not coupled with the physicality of steps *toward* the officers (like the threat in *Scott v. Palmer*). If anything, the video evidence shows that as Plaintiff made the statement, he was moving *away* from Defendants. (Doc. # 47-4 at 18:25:45 to 18:25:48). Thus, Plaintiff's actions were similar to those in *D.A.D.O*, where the Alabama Court of Civil Appeals found the conduct did not rise to a level

of physical interference. The Rule 56 evidence does not support a finding that Plaintiff's actions

qualified as intimidation or physical interference under § 13A-10-2.

**b.        Independently Unlawful Acts**

In the alternative, Defendants argue that Plaintiff's failure to identify himself during their

investigation is an independently unlawful act under Alabama Code § 13A-10-2(a) that prevented

the officers from being able to conduct their investigation at the scene. This argument hinges on

the contention that Plaintiff's failure to identify himself to the officers violated Alabama Code §

15-5-30, which states:

> A sheriff or other officer acting as sheriff, his deputy or any constable, acting within
> their respective counties, any marshal, deputy marshal or policeman of any
> incorporated city or town within the limits of the county or any highway patrolman
> or state trooper may stop any person abroad in a public place whom he reasonably
> suspects is committing, has committed, or is about to commit a felony or other
> public offense and may demand of him his name, address, and an explanation of
> his actions.

Ala. Code § 15-5-30.

Plaintiff presents three arguments as to why Defendants did not have probable cause to

arrest him for a violation under § 13A-10-2(a). The court addresses each argument, in turn.

First, Plaintiff contends that Defendants had no arguable reasonable suspicion that Plaintiff

was committing, had committed, or was about to commit a felony or other public offense to warrant

them asking for his name, address, or explanation of his actions. (Doc. # 51-1 at 10). The court

disagrees.

A law enforcement officer may "seize" a person to conduct a brief investigation if "(1) the

officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in,

criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which

justified the interference in the first place.'" *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)).

"Whether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable police officer at the scene ... and [presents] a question of law." *Evans v. Stephens*, 407 F.3d 1272, 1280 (11th Cir. 2005) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The existence of "reasonable suspicion" is determined according to the totality of the circumstances. *Jordan*, 635 F.3d at 1186. At a minimum, reasonable suspicion requires "specific, articulable, and objective facts reasonably to suspect that a crime is being or will soon be committed … but is a less demanding standard than probable cause." *United States v. Babcock*, 924 F.3d 1180, 1187 (11th Cir. 2019) (citing *United States v. Puglisi*, 723 F.2d 779, 789 (11th Cir. 1984); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)) (quotations omitted).

Defendant Smith was dispatched to the scene in response to a 911 call reporting that the homeowners were out of town, there was an unknown gold vehicle parked in front of the house, and people were present who the caller believed should not be there. Further, the 911 caller stated that the owners of the home were an elderly white couple, but she had seen a black male and believed people may be in the house. When Defendant Smith arrived, he observed a gold vehicle and Plaintiff -- a black male -- in the yard, watering the plants.

Plaintiff contends that Defendant Smith possessed no reasonable suspicion because he did not see any illegal activity when he arrived on the scene. However, this assertion misses the mark by a wide margin because officers are not required to actually observe criminal conduct; rather, they may form reasonable suspicion of criminal activity even when observing exclusively legal activity. *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). Of course, a 911 call from an identified caller describing contemporaneous criminal behavior is sufficient to provide

reasonable suspicion, so long as the information bears an indicia of reliability. *See U.S. v. McCall*, 563 Fed. Appx. 696, 700-01 (11th Cir. 2014). Here, the totality of the circumstances, including the 911 call from an identified caller and the presence of a suspect similar to the description given by the caller, gave Defendant Smith more than enough "specific, articulable, and objective facts" to believe Plaintiff may have been trespassing on the property and that other individuals could be on the property. *Babcock*, 924 F.3d at 1187. The fact that plaintiff was watering flowers outside the house does not foreclose a finding of reasonable suspicion. A savvy criminal could easily pick up a watering hose to use as a ruse when officers approach. *See United States v. Bruce*, 977 F.3d 1112, 1119 (11th Cir. 2020) ("The 'absence of additional suspicious conduct' when the police arrived did not 'dispel the reasonable suspicion' of criminal activity…those engaged in criminal activity would rationally be inspired to hide it at the first sign of police.") (citations omitted). Therefore, it goes without saying that Defendant Smith's request for Plaintiff's name was reasonably related to the circumstances prompting his talking to him.

Second, Plaintiff argues that even if the Defendants had reasonable suspicion to ask him for identifying information, Alabama Code § 15-5-30 applies to individuals stopped in public places and Plaintiff was under no legal obligation to provide his name to Defendants because he was on private property at the time of the investigation. (Doc. # 51-1 at 17). To support this argument, Plaintiff cites Alabama Code § 22-15(A)-3(8), which states that a private residence is not a public place. Plaintiff fails to read this statutory provision in its full context: Section 22-15(A)-3(8) is a part of Alabama's "Clean Indoor Air Act," which, under § 22-15(A)-4, prohibits smoking in a "public place." In that context, a private residence is understandably not a public place for purposes of a ban on smoking. But, that point is inapposite to the situation here. Without question, a valid warrantless stop can take place on private property, including the property's

curtilage, so long as the area is exposed to public view. *See United States v. Santana*, 427 U.S. 38, 42 (1976).

Finally, Plaintiff argues that he did not violate § 13A-10-2(a) because he told Defendants his name was "Pastor Jennings" when Defendant Smith first arrived at the scene. Plaintiff further contends that he believed that any other requests from Defendants for identification throughout the investigation were for his driver's license, which he was under no requirement to produce. (Doc. # 51-1 at 17). In contrast, Defendants contend that they were not asking Plaintiff to identify himself by submitting his physical driver's license, but instead only by stating his name so that they could identify him and confirm he was not engaged in illegal activity. (Doc. # 56 at 12).

The court notes that Defendant Smith did initially inquire if Plaintiff had any form of physical identification. (Doc. # 47-4 at 18:24:45 to 18:24:48). However, the totality of the dialogue in the video indicates that the actual concern of Defendants was the lack of *any* real identification made by Plaintiff. Throughout the remainder of the encounter (until Plaintiff's eventual arrest), Defendants repeatedly asked him to identify himself and they did not again request physical identification. Plaintiff is correct that he was under no requirement to give Defendants his driver's license as Alabama Code § 15-5-30 does not require a suspect to give the officers a driver's license or any other document. *Edger v. McCabe*, No. 21-14396, 2023 WL 6937465, at *6 (11th Cir. 2023). But, the statute requires that a suspect, in circumstances such as this, either state his name or identify himself to an officer by some other means. *Id*.

To be sure, Plaintiff stated to Defendant Smith when he first walked up that he was "Pastor Jennings." However, despite multiple other requests from the Defendants during their investigation, Plaintiff refused to give any information more than that. Although Plaintiff asserts that Defendants only arrested him because he refused to give them his physical driver's license

15

(Doc. # 51-1 at 28), the body camera footage presents undisputed evidence that is simply not so. That is, the video clearly shows Defendant stating that they arrested Plaintiff because they were responding to a call and Plaintiff would not give them his name or other information, which prevented them from investigating what was occurring at the scene, in violation of § 15-5-30. (Doc. # 47-4 at 18:38 to 18:39:14).

Further, footage shows Defendant Smith clearly stating that if Plaintiff had only identified himself, it might have dispelled any initial reasonable suspicion, because "Pastor Jennings" was not a name but a title. (*Id.* at 18:32:55 to 18:33:07). Indeed, in the discussion about whether to charge Plaintiff, Defendant Gable remarked, "He seems like a reasonable nice guy, I don't understand … just talk to us man …" (Doc. # 47-4 at 18:39:35 to 18:39:55). Defendant Smith reiterated this in his deposition testimony: "Pastor is a title. Jennings would be a first name or could be a last name." (Doc. # 47-3 at 5).

It is well established that an individual can be arrested under a state stop-and-identify statute for failing to give his full name to officers. *See Brienza v. City of Peachtree City, Georgia*, 2022 WL 3841095, at *2, *7 (11th Cir. 2022) (holding that officers had probable cause to arrest a suspect for only giving his first name, but not his last name or birth date to officers). That is precisely what occurred here.

To the extent Plaintiff contends that stating he was "Pastor Jennings" was sufficient here, that contention is off the mark. "Pastor Jennings" cannot be entered into a database to search government records, and without any other accompanying information, that information would do nothing to help officers determine an individual's history or why they were at the scene. "Obtaining a suspect's name in the course of a….stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense or has a record of

violence or mental disorder. On the other hand, knowing [a person's] identity may help clear a suspect and allow the police to concentrate their efforts elsewhere." *Hiibel*, 542 U.S. at 186.

In fact, it was not until well after Plaintiff was arrested that he ever told the officers his full name – Michael Jennings. (Doc. # 48-8 at 18:32:10). Video evidence clearly shows officers stating, "We're here to investigate a call and he wouldn't give us his name," (*Id.* at 18:39:07) and then explaining to Plaintiff's wife that he had not identified himself until he had "already caught the charge." (*Id.* at 18:42:55 to 18:43:00).

Plaintiff's contention that Defendants lacked probable cause to arrest him misses the mark. The Rule 56 evidence shows that it is undisputed that Defendants had probable cause to arrest Plaintiff:

- Defendants received a 911 call requesting officers to come check on a neighbor's house. The caller stated that her neighbors were elderly and white, but that there was a black male in the yard and potentially others in the house. In addition, there was an unknown gold vehicle parked in front of the house.

- Defendant Smith arrived at the scene and saw both a gold SUV in the driveway and a black male standing in the yard, holding a watering hose. Defendant Smith did not know if Plaintiff was legally on the property, if he was genuinely watering the plants, or if there were other individuals located elsewhere on the property.

- The second Defendant Smith asked if he had any form of identification, Plaintiff became hostile.

- Plaintiff repeatedly refused to identify himself and immediately accused Defendants of wanting to lock him up.

- Plaintiff walked away from Defendants and pulled out his phone, refusing to talk to them, even when Defendant Gable warned him he was nearing an obstruction charge.

- Defendants repeatedly informed Plaintiff they did not want to arrest him but only wanted him to communicate with them. Each time he was asked to do so, Plaintiff refused to share his identity with Defendants, instead telling them he did not have to identify himself and daring them to "go ahead and lock [him] up."

- Plaintiff repeatedly told officers "It's already a lawsuit," before he loudly yelled at Defendant Brooks, "You don't talk to me like I'm a child, Boy."

- Plaintiff did not state his full name – Michael Jennings – to Defendants until he had already been placed under arrest.

For these reasons, the court has no hesitation in determining that Defendants possessed probable cause to arrest Plaintiff for violating Alabama Code § 13A-10-2(a). By refusing to give his full name to officers, Plaintiff did not comply with § 15-5-30, which gives a law enforcement officer the authority to "stop any person abroad in a public place whom he reasonably suspects is committing, has committed, or is about to commit a felony or other public offense and…demand of him his name, address, and an explanation of his actions." Ala. Code § 15-5-30. This flat refusal amounted to an independent unlawful act. And, it is clear it prevented the officers from performing a governmental function – investigating the 911 call about people potentially trespassing on the subject property. Thus, "the facts within the collective knowledge of [the] law enforcement officials, derived from reasonably trustworthy information" were sufficient to cause the officers to believe that Plaintiff had committed the criminal offense of obstructing government operations. *Brown*, 608 F.3d at 734 (citing *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997)).

### c.  Qualified Immunity

Even if Defendants did not possess actual probable cause to arrest Plaintiff for obstructing governmental operations (and, to be clear, the court finds that it is undisputed they did), Defendants are still immune from civil damages under the doctrine of qualified immunity.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To receive qualified immunity's shield

18

of protection, a public official must show that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Courson v. McMillan*, 939 F.2d 1479, 1487 (11th Cir. 1991)). There is no question that the officers were acting in their discretionary authority by responding to a 911 call at the time they arrested Plaintiff.

And because Defendants Smith, Gable, and Brooks were acting within the scope of their discretionary authority at the time the arrest was made, the burden shifts to Plaintiff to show that qualified immunity is inappropriate. *Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018).

An officer is entitled to qualified immunity unless (1) he has committed a constitutional violation, <u>and</u> (2) the constitutional right was "clearly established" at the time of the officer's alleged misconduct. *Pearson*, 555 U.S. at 232 (holding that a court may consider these two prongs in any order, as opposed to the rigid two-step process outlined in *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Further, for an officer to be entitled to qualified immunity, he need not have actual probable cause, but only arguable probable cause. *Morris v. Town of Lexington Ala.*, 748 F.3d 1316, 1324 (11th Cir. 2014). "In the false arrest context, arguable probable cause exists where 'a reasonable officer, looking at the entire legal landscape at the time of the arrest[], could have interpreted the law as permitting the arrest[].'" *Edger v. McCabe*, No. 21-14396, 2023 WL 6937465, at *4 (11th Cir. 2023) (quoting *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023)).

Importantly, Eleventh Circuit caselaw makes clear that whether an officer possesses arguable probable cause is an individualized inquiry that must be made on a case-by-case basis. *See Edger*, 2023 WL 6937465, at *4 (citing *Rivas-Villegas v. Cortesluna*, 585 U.S. 1, 8 (2021)) ("[T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition"). Thus, Defendants are entitled to qualified immunity if reasonable officers

in *their* position reasonably could have believed that Plaintiff was obstructing governmental operations as defined by Alabama Code § 13A-10-2.

Consistent with the court's discussion above, the court is not convinced that a reasonable officer could have looked at Plaintiff's behavior and found that he was physically interfering with Defendants' operations or intimidating them. So, the question becomes this: whether Defendants reasonably believed that there was probable cause to permit the arrest based on the independently unlawful act prong of § 13A-10-2?

Plaintiff argues that the court must find that Defendants did not possess arguable probable cause under the Eleventh Circuit's recent decision of *Edger v. McCabe*, which held that an officer was not entitled to qualified immunity after wrongly arresting an individual for failing to provide his driver's license. But, as the *Edger* panel made clear, "whether an officer possesses either actual or arguable probable cause 'depends on the elements of the alleged crime and the operative fact pattern'" in a specific case. *Edger*, 2023 WL 6937465, at *4 (citing *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010)). *Edger* does not control here because it involved very different key facts.

There are some similarities. The Officers in *Edger* responded to a 911 call reporting a suspicious person on private property. *Edger*, 2023 WL 6937465, at *1. And, like here, upon arriving at the scene, Officer McCabe initially asked Edger if he had "driver's license or ID" on him. *Id.* at *2. However, the similarities between *Edger* and this case end there. In *Edger*, the video evidence clearly showed that Officer McCabe arrested Edger within two minutes of arriving at the scene *solely* because Edger refused to give the officers his physical driver's license. *Id.* And, despite video evidence showing Edger offering his driver's license to Officer McCabe at least three

times before she could finish handcuffing him, Officer McCabe arrested Edger without ever asking him for his name. *Id.*

The facts of this case are drastically different. When Defendant Smith walked up on the scene, he initially asked Plaintiff if he had any form of physical identification. Had Defendant Smith arrested Plaintiff at that point, solely for failing to give him his driver's license, this case would align with *Edger* and there would be a clear violation of § 15-5-30. However, the video evidence here indisputably shows that, throughout the rest of the encounter, Defendants only asked Plaintiff to *identify* himself – not to produce his driver's license. It was not until Plaintiff had repeatedly refused to identify himself and refused to cooperate with the officers that he was arrested. Indeed, Defendant Smith stated that if Plaintiff had simply told them his name, it may have dispelled any suspicion. Although a panel of our Circuit has ruled that § 15-5-30 only allows a police officer to ask an individual for his name, address, and explanation of his actions, there are no "'magic words' that must be uttered." *Edger*, 2023 WL 6937465, at *6.

Here, Defendants' request for Plaintiff to identify himself fits squarely within the confines of the state statute. The undisputed body camera footage makes clear that at multiple times during their interaction with Plaintiff, Defendants asked Plaintiff to identify himself. Yet, each time, Plaintiff adamantly refused. Defendants gave Plaintiff several opportunities to cooperate before ultimately arresting him. Therefore, unlike the circumstance in *Edger*, Plaintiff was not arrested because he simply refused to give Defendants his driver's license. Rather, over and over again, he refused to identify himself in any manner that would allow them to know who he is and confirm what he was doing at the house was not illegal.

Plaintiff points out that initially he stated that his name was "Pastor Jennings." But, a reasonable officer could have understood such a reference, without more, was insufficient under

the circumstances. And, no clearly established law holds that an officer violates the rights of a citizen, in a situation like this, when arresting him for failing to provide his identity, even if some short-hand reference (*e.g.*, "Pastor Jennings") is given. *See Hiibel*, 542 U.S. at 187-88 (upholding a state law permitting arrest for failing to identify oneself – where the request for identification is reasonably related to circumstances justifying the stop – as "consistent with Fourth Amendment prohibitions against unreasonable searches and seizures").[2]

Therefore, this court disagrees with Plaintiff's assertion that this case is like *Edger*. Here, Defendants repeatedly requested Plaintiff's name, not his driver's license. Because Plaintiff refused to give this information to them, Defendants reasonably interpreted the law as permitting the arrest and qualified immunity attaches to their actions.  Thus, even if Plaintiff's failure to identify himself to Defendants did not provide probable cause to arrest under § 13A-10-2 (and, to the contrary, the court concludes it did), this court finds that Defendants still had "breathing room to make the purported mistake of law" when they arrested Plaintiff. *Vanegas*, 46 F.4th at 1167.

### 2.    Retaliatory Arrest

Plaintiff also alleges that he was only arrested by Defendants in retaliation for engaging in constitutionally protected speech and conduct. That argument finds no support in the summary judgment record.

To allege a First Amendment retaliatory arrest claim under Section 1983, a plaintiff generally must show: (1) that he engaged in constitutionally protected speech; (2) the defendant's retaliatory conduct adversely affected that protected speech; and (3) a causal connection exists

---

[2] Cases from other jurisdictions do not clearly establish the law. But, the court notes that decisions from the Ninth Circuit are actually consistent with this legal point. *See Vanegas v. City of Pasadena*, 46 F.4th 1159, 1166 (9th Cir. 2022) (holding that officers had qualified immunity for arresting an individual for failing to identify himself to them when they asked him several times); *United States v. Landeros*, 913 F.3d 862, 869 (9th Cir. 2019) ("In some circumstances, a suspect may be required to respond to an officer's request to identify herself, and may be arrested if she does not.").

between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). Of course, "it is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured – the motive must *cause* the injury. Specifically, it must be the 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

Under the standard set forth by the Supreme Court in *Nieves*, a plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest to succeed. 139 S. Ct. at 1724. Therefore, "the presence of probable cause will generally defeat a § 1983 First Amendment retaliation claim…as a matter of law." *DeMartini*, 942 F.3d at 1304.

Again, here, Defendants had probable cause to arrest Plaintiff for violating § 13A-10-2(a). Under that statute, an individual is guilty of obstructing governmental operations "if, by means of intimidation, physical force or interference or by any other independent unlawful act, he…intentionally prevents a public servant from performing a governmental function." Ala. Code § 13A-10-2. Plaintiff committed an unlawful act when he refused to give his name, address, or otherwise explain his actions to officers as they were investigating the 911 call. Ala. Code § 15-5-30. This, alone, defeats Plaintiff's retaliatory arrest claim.[3]

---

[3] Plaintiff also argues that because he was arrested right after he said, "You don't shut your mouth. You don't talk to me like I'm a child, boy," the officers made the decision to arrest him in retaliation for his protected speech. The undisputed evidence -- *i.e.*, video footage of the encounter in the Rule 56 record -- does not support that argument either. Even assessing that argument without the benefit of the video footage, it is completely lawful for Defendants to have made the decision to arrest Plaintiff after hearing the content of these words, particularly when coupled with his other actions. "Protected speech is often a wholly legitimate consideration for officers when deciding whether to make an arrest." *Nieves,* 139 S. Ct. at 1724. Because officers must make split-second judgments when deciding whether to arrest a suspect, the content and manner of any conversation with the suspect may convey vital information such as "if he's ready to cooperate or rather presents a continuing threat" to interests the law must protect. *Id.*; *see also Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 1946, 1953 (2018). Plaintiff's allegedly protected words quite clearly conveyed that he was not willing to cooperate with the officers' legitimate request to identify himself.

Because the court determines that Defendants had probable cause to arrest Plaintiff for violating § 13A-10-2(a), summary judgment for Defendants on Plaintiff's retaliatory arrest claim is warranted.

### B.      Plaintiff's State-Law False Arrest Claim

In addition to Plaintiff's federal claims under Section 1983, Plaintiff has asserted a state law claim against Defendants for false arrest. Defendants argue that they are entitled to summary judgment on this claim because they are entitled to state-agent immunity under Alabama law.

Under Alabama law, a municipal officer is immune from state tort liability "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a) (1975). "This immunity applies 'when the conduct made the basis of the claim against the [officer] is based upon the [officer's] exercising judgment in the enforcement of the criminal law of [Alabama], including, but not limited to, law enforcement officers' arresting or attempting to arrest persons…". *Scott v. Palmer*, 210 F. Supp. 3d 1303, 1315 (N.D. Ala. 2016) (quoting *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006)). However, the state-agent immunity does not apply when officers act "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex Parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

---

Plaintiff also argues that Defendants' statements to the 911 caller indicating that Plaintiff would only talk about "racial profiling" and "suing" are evidence that the officers' true reason for arresting him was because of those statements. But again, in analyzing a retaliatory arrest claim, the subjective intent of the officers is irrelevant. It simply does not provide any basis for invalidating an arrest. *Nieves*, 139 S. Ct. at 1725 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004)). Rather, when reviewing an arrest, the courts asks "whether the circumstances, viewed objectively, justify the [challenged] action, and if so, concludes 'that action was reasonable whatever the subjective intent motivating the relevant officials.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011)). Because the court has already found that there was probable cause to arrest Plaintiff for obstructing governmental operations, any subjective intent that he alleges Defendants possessed is irrelevant.

Plaintiff argues that Defendants are not entitled to summary judgment on the state law false arrest claim because they acted "willfully, maliciously, fraudulently, in bad faith, [and] beyond their authority in detaining and arresting" him and because they acted under a mistaken interpretation of the law. (Doc. # 51-1 at 24). The record lends no support to that argument. Indeed, to the contrary, the Rule 56 evidence shows that Defendants did not act willfully, maliciously, or in bad faith with respect to Plaintiff's false arrest claim.

"In the false arrest context, the Alabama Supreme Court considers the presence of arguable probable cause irreconcilable with the allegations of malice or bad faith." *Scott*, 210 F. Supp. 3d at 1316. As noted above, Defendants had (at least) arguable probable cause to arrest Plaintiff under § 13A-10-2 due to Plaintiff's refusal to identify himself to the investigating officers. Therefore, because arguable probable cause existed for Defendants to arrest Plaintiff, Defendants cannot be found to have acted willfully, maliciously, or in bath faith in doing so. *See Ex Parte Harris*, 216 So. 3d 1201, 1214 (Ala. 2016) ("Because Harris had arguable probable cause to arrest Bryson, we cannot say that he acted 'willfully, maliciously, fraudulently, [or] in bad faith' so as to remove him from the umbrella of State-agent immunity afforded to him under *Ex Parte Cranman*.").

There is simply no Rule 56 evidence that Defendants acted under a mistaken interpretation of the law when arresting Plaintiff. Under § 13A-10-2, officers may arrest an individual if, by another independent unlawful act, he intentionally prevents a public servant from performing a governmental function. Ala. Code § 13A-10-2. As addressed above, although Plaintiff alleges that Defendants only arrested him because he refused to give them his physical driver's license (Doc. # 51-1 at 28), the body camera footage undisputedly shows otherwise. That is, video from the scene clearly shows Defendants stating that they arrested Plaintiff after responding to a call when Plaintiff would not give them his name or other information, all in violation of § 15-5-30. (Doc. #

47-4 at 18:38 to 18:39:14). Further, Defendant Smith made clear that (1) if Plaintiff had only told him his name, it might have dispelled any suspicion, and (2) his self-identification as "Pastor Jennings" was not useful to get a sense of what was occurring. (*Id.* at 18:32:55 to 18:33:07). Under these undisputed facts, even when they are viewed in the light most favorable to Plaintiff, it is obvious that Defendants were not acting under a mistaken interpretation of the law when they arrested Plaintiff for failing to identify himself. Therefore, the Defendants are entitled to state-agent immunity under Alabama law, and summary judgment in their favor is appropriate.

## IV.   Conclusion

For the reasons discussed above, summary judgment is due to be granted**.** An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this December 21, 2023.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE